UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 17 CR 00611-7 |
| KEITH CHATMAN | Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Defendant Keith Chatman ("Chatman") pleaded guilty to engaging in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) on behalf of the Four Corner Hustlers street gang in Chicago. The government further contends, and Chatman denies, that as part of that pattern of racketeering activity, he participated in the murders of two minors and an attempted murder of a third minor on August 2, 2012. R. 561 at 8 (plea agreement describing the murders and attempted murder as "Racketeering Act One"). In determining whether to consider these homicides and attempted homicides for sentencing purposes, this Court held multiple evidentiary hearings at which the only witness who definitively linked Chatman to the murders was co-defendant and fellow Four Corner Hustlers member, Sammie Booker. Based almost entirely on Booker's testimony, this Court found that Chatman committed the murders and attempted murder. Chatman then filed a motion to reopen the hearings because of new evidence (R. 994), and the Court held further evidentiary hearings. Because the new evidence raises issues the Court cannot reconcile with Booker's version of events, Chatman's motion for reconsideration (R. 1458) is granted, and this Court finds that the government has not proved that Chatman committed the

1

murders and attempted murder described in Racketeering Act One by a preponderance of the evidence.

## Background

On August 2, 2012, two teenagers were murdered on the 600 block of North Avers Avenue in Chicago, Illinois. A third teenager suffered a gunshot wound to the leg and survived. Chicago police spoke with many on-scene witnesses on the day of the murders. No one was prosecuted for the murders and attempted murder.

On August 27, 2019, Chatman entered a plea deal in which he pleaded guilty to one count of racketeering conspiracy and admitted that he possessed cocaine, heroin, and marijuana with the intent to distribute from 2009 to 2013. R. 561 at 5–7. The plea deal also contained the government's contention that Chatman participated in the August 2, 2012 homicides and attempted homicide, as well as another attempted murder which is not at issue here. *Id.* at 8–9. Chatman denies his involvement in any murders or attempted murders. *Id.* Whether the Court considers these homicides for the purposes of sentencing could substantially affect the sentence Chatman receives. *Id.* at 12 (detailing the government's position that if the homicides are considered, the total offense level is 43, but otherwise, Chatman argues it is 19).

The Court held evidentiary hearings and oral arguments on November 20, December 4, and December 17, 2019 concerning Chatman's alleged involvement in the murders. The government called six witnesses, including the surviving victim, three eyewitnesses, a CPD evidence technician, and Booker. The victim and three eyewitnesses testified generally that they saw a dark sedan containing three or four

black males drive down North Avers at the time of the shootings and a black male with dreads reach his hand out of the rear passenger window and shoot an automatic weapon. They could not identify who was in the dark sedan, and their accounts of the events contained some minor contradictions that the Court attributed to the vagaries of memory seven years after the event. R. 750 at 63 ("People say [the windows] were tinted; people say they weren't. People say [the shooter was] hanging out the window; people say . . . it was just hands. People say they were wearing red hats; people say they were pulling T-shirts up to cover their faces. . . . Some people say there were three people in the car; some people say there were four people in the car."). The defense did not call any witnesses but introduced testimony through CPD reports. One witness the government did not call but who appeared in CPD reports was Christian Coleman. On the day of the murders, Coleman identified the shooters as Martell and Ricky Rhodes ("Tails" and "Fonze"), who were members of the Conservative Vice Lords ("CVLs"), a rival gang. *Id.* at 79. Ultimately, this evidence did not carry much weight because Coleman recanted his statements when he testified before the Grand Jury. *Id.* at 28.

The only witness who definitively tied Chatman to the murders was Booker, who was nicknamed "Terminator" because he acted as a "shooter" for Four Corner Hustlers leader, Labar Spann. R. 653 at 191–92. Booker admitted to participating in five murders at Spann's direction, as well as numerous other crimes. *Id.*; R. 636. In his plea agreement, he agreed to cooperate with the government and provide truthful testimony against his co-conspirators in exchange for a lowered sentencing

recommendation of 25 to 35 years instead of life imprisonment. R. 750 at 116; R. 636 at 17. Booker testified that the day before the murders, a man named Dominique Green (also known as "Snoopy") was murdered. Snoopy was a friend of Chatman. R. 750 at 126. Spann called Booker, told him about Snoopy's death, and that he thought members of the CVLs were responsible. *Id.* at 127.

The next morning, Booker left his registered parole address and went to his mother's house. *Id.* Some hours later, Spann picked up Booker in a white van. *Id.* at 128. Spann, who was confined to a wheelchair, was driven by an associate nicknamed "Ronnie Boo Boo." *Id.* at 128–29. Booker testified he got in Ronnie Boo Boo's van with Spann in the backseat. *Id.* Booker testified that they drove north on Hamlin, then west onto Huron, and then south onto Avers, which was a one-way southbound road. *Id.* at 130–31. Once on Avers, the van pulled up behind a black Nissan Altima. *Id.* at 132. Booker testified that Spann then received a phone call and stated, "we're here," and "go ahead," immediately after which shooting came from the Altima. *Id.* Booker claimed he saw Chatman hanging his upper body out of the rear passenger window, firing an assault rifle. *Id.* at 132–34.

Booker then claimed that Spann ordered that the van drive past the scene of the crime, circle the block, and drive past the scene again because he "want[ed] to see something." *Id.* at 135–37. Booker stated he did not see any of the victims and no one remarked on them, even though one victim's body would have been partially in the street. *Id.* According to Booker, Spann received a call from Chatman, and the passengers in the van later met up with Chatman and others at Spann's girlfriend's

4

house after the shooting. *Id.* at 138. Booker claimed that Spann asked Chatman why he didn't wait to shoot until he saw the men they suspected of killing Snoopy, to which Chatman replied, "Fuck em. They ain't gonna work over there no more," in apparent reference to the Four Corner Hustlers' war over drug sale territory with the CVLs. *Id.* at 139, 142–43. He also claimed that Chatman dropped an assault rifle off at his house about a week after the shooting. *Id.* at 186. Because Booker was the only witness tying Chatman to the murders, this Court noted that "the key issue . . . is why I should believe Booker, or why I should not believe him." R. 750 at 59. Acknowledging that his testimony should be handled with "great caution and care," this Court nevertheless found his testimony to be credible and found that Chatman was involved in the murders by a preponderance of the evidence. R. 708 at 8–15.

On January 23, 2021, Chatman filed a motion to reopen the evidentiary hearings based on new evidence that the government produced to defense counsel after the Court made its evidentiary findings. R. 994. There were two notable pieces of new evidence. First, CPD pod cam footage on August 2, 2012 of Hamlin and Huron, the intersection at which Booker claims Ronnie Boo Boo turned west, does not show Ronnie Boo Boo's white van on the day of the murders. R. 154–57. Second, and most concerning, were Booker and Spann's IDOC electronic monitoring ("EM") records from the day of August 2, 2012. Booker's EM records are not enlightening, as they show he was away from his registered address from 7:08 a.m. to 11:05 p.m. R. 994-4 at 2; R. 1459 at 10. But Spann's EM records, which list his registered address as 1636 North Melvina Avenue in Chicago, show that, on August 2, 2012, his ankle monitor

recorded that he left the 150-foot radius of the transmitter box at that address at 12:37 p.m. R. 994-3 at 1; R. 994-4 at 3; R. 1459 at 8. The first 9-1-1 call reporting the shooting occurred at 12:49 p.m. R. 1459 at 6. All of these facts are stipulated by the parties. *See* R. 1459.

Consequently, for Booker's version of events to have occurred consistent with the new EM evidence, Spann would have had to leave the 150-foot radius of the transmitter at his registered address at 1636 North Melvina,[1] ride in Ronnie Boo Boo's van to 3839 West Monroe (Booker's mother's house), stop to pick up Booker, ride to the 600 block of North Avers, stop, and make the "go ahead" call to Chatman, all in 12 minutes. Chatman alleges that this is a physical impossibility because GPS and online map software put the journey between the three addresses at 20 to 24 minutes, not including any time for traffic and the alleged stops. R. 994.

This Court therefore held additional evidentiary hearings on May 26 and October 21, 2022 regarding the new evidence. At the first hearing, Chatman called Michael Colella, a private investigator hired by his attorneys to travel the route Booker claimed Ronnie Boo Boo traveled on the day of the murders and to find the shortest possible time to make that journey. R. 1433 at 23. The investigator testified that he relied on a GPS app on his phone to find the fastest possible route, and timed

---

[1] Chatman alleges that Spann would have left the range of the transmitter the second he left the house, meaning that the 12 minutes would also include the time it would have taken for Ronnie Boo Boo to load Spann and his wheelchair into the van. It is unclear whether or not this is the case, given that there is no evidence about the location of the transmitter in relation to where Ronnie Boo Boo would have parked his van.

6

the trip on a weekday at the same time of day that Booker claimed the trip occurred. *Id.* at 24–26. He testified that he traveled "well above the posted speed limits," drove through at least one red light, and drove "aggressively" while still being safe. *Id.* at 30, 64. He further stated that the route contained 14 speed bumps and some train tracks. *Id.* at 30–31. Collela ultimately testified that his drive took 24 minutes to complete, and that, in his opinion, it would be a physical impossibility to cut that time in nearly half. *Id.* at 58.

At the October 2022 hearing, the government called Booker to testify again. He recounted his version of the events, and this time stated that Ronnie Boo Boo was driving "pretty fast" and rolled through a stop sign, and that Ronnie Boo Boo knew the area and streets well. R. 1445 at 126–27, 158, 170–71, 190. After reviewing the pod cam footage which showed that Ronnie Boo Boo's white van did not appear at the intersection of Huron and Hamlin, he recanted his earlier testimony regarding the route the van took (*see* R. 750 at 131 (Q: "Did you turn on Huron or did you hit the alley before Huron?" A: "No, we turned on Huron."); R. 1445 at 129–30) and instead stated that he remembered that the van turned left into an alley before Huron. R. 1445 at 163–64. Chatman's counsel highlighted a few other minor inconsistencies in his testimony, for example, that Booker stated that he was sitting on the rear passenger side of the vehicle three times, before correcting himself and stating he was sitting on the driver's side. *Id.* at 138–39. The government provided no further evidence or witnesses.

7

## Analysis

The evidentiary burden for proving a fact at issue that impacts sentencing is relatively low. The Sentencing Guidelines state that, when "any factor important to the sentencing determination is reasonably in dispute," the court should give the parties "an adequate opportunity to present information," including by evidentiary hearings when the circumstances warrant it. U.S.S.G. 6A1.3. In resolving the dispute, the court can consider all relevant information, including evidence which would be inadmissible at trial under the Federal Rules of Evidence, so long as the information "has sufficient indicia of reliability to support its probable accuracy." *Id.* "The threshold for a sufficient reliability finding is low." *United States v. Rollerson*, 7 F.4th 565, 569 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 631 (2021) (internal quotations omitted). It is well established that "a preponderance of the evidence is all that is required for a factual finding under the Sentencing Guidelines." *United States v. Ofcky*, 237 F.3d 904, 908 (7th Cir. 2001) (quoting *United States v. Porter*, 23 F.3d 1274, 1277 (7th Cir. 1994)). Indeed, a court may even consider acquitted conduct as part of its sentencing determinations "so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997). Therefore, although Booker is a potentially biased and unreliable witness because of his prior crimes and his incentives to implicate his co-defendants, this Court still originally found his account reliable because he did not "wilt under pressure" on the witness stand, and his testimony was largely consistent with those of the other eyewitnesses. R. 750 at 59. But the new evidence calls that reliability into question.

When considering whether to overturn its prior credibility findings with respect to a witness's testimony, a court considers whether the testimony would have been "physically impossible for the witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007). A court's credibility findings are ripe for reversal when the witness's statements are "internally inconsistent, implausible, or contradicted by extrinsic evidence." *United States v. Blake*, 814 F.3d 851, 855 (7th Cir. 2016) (citing *Ortiz v. Martinez*, 789 F.3d 722, 729 (7th Cir. 2015)). On the other hand, minor inconsistencies or discrepancies in a witness's testimony are not a reason to disturb a credibility finding. *United States v. Freeman*, 691 F.3d 893, 900 (7th Cir. 2012).

Here, the minor inconsistencies in Booker's testimony and the competing eyewitness accounts do not by themselves make Booker's testimony unreliable. Even his recanting of Ronnie Boo Boo's west turn onto Huron, in response to the pod cam footage, could be easily explained by factors such as a lack of attention, his lack of reference to a map or picture of the intersection when he first testified, or a faulty memory. But when those inconsistencies are combined with extrinsic evidence that make Booker's story nearly physically impossible (if not according to the laws of nature, at least according to the laws of traffic), there is no longer sufficient indicia of reliability to credit Booker's testimony.

The government provided no evidence to bolster Booker's testimony or to show that Booker's version of events could have occurred consistent with the timeline

9

necessitated by the EM records. If Collela's testimony regarding the trip time was somehow unreliable, the government could have asked its own investigator to make the same trip and provide evidence of a shorter drive time. It chose not to do that. The government has instead merely questioned Collela's personal knowledge of the west side of Chicago compared to Ronnie Boo Boo's, the fact that Collela's version of aggressive driving, as a self-identified "suburb person," may be different than a person who lives in the city, and that Collela did not note what the speed limits were. R. 1467 at 10–13. But even crediting the government's arguments, it still has not explained how Ronnie Boo Boo could have made the trip in *half* the time as a person who claims to have driven well above the speed limit and disregarded traffic laws. That Ronnie Boo Boo also apparently made a stop to pick up Booker and stopped behind the Altima with enough time for Spann to give the "go ahead," and that the 12 minutes also includes the shooting and the amount of time it took for a witness to call 9-1-1 lend further implausibility to the supposed timeline of events.

Collela's testimony that the trip from 1636 North Melvina to 3839 West Monroe to the 600 block of North Avers takes at least 20 minutes is further reinforced by Google Maps and MapQuest, which state that a trip between the three addresses takes 20 to 24 minutes with no traffic or stops. *Lee v. Hanjin Intermodal Am., Inc.*, No. 16-CV-08610, 2021 WL 534661, at *8 n.4 (N.D. Ill. Feb. 12, 2021) ("The court can take judicial notice of locations, approximate distances, and transit times from Google Maps.") (citing *Moore v. Magiera Diesel Injection Serv., Inc.*, No. 18-cv-03762, 2019

10

WL 2502029, *3 (N.D. Ill. June 17, 2019) and *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013)).

Though this Court found Booker to be a believable witness during the original hearings, the EM records have thus rendered his story "implausible" and "contradicted by extrinsic evidence." *Blake*, 814 F.3d at 855. This Court can no longer say that Booker's testimony for this issue is reliable, and no other witnesses' testimony is sufficient to implicate Chatman. Therefore, this Court's prior finding that Chatman participated in the August 2, 2012 murders and attempted murder is overturned.

## CONCLUSION

For the foregoing reasons, Chatman's motion for reconsideration (R. 1458) is granted. This Court will not consider the August 2, 2012 murders described in Racketeering Act One in Chatman's plea agreement for purposes of Chatman's sentence. Because the Court already held additional evidentiary hearings and considered additional evidence, Chatman's motion to reopen the evidentiary hearings (R. 994) is moot.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: April 13, 2023

11